PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO.  4:21CR120 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| RAPHAEL ORTIZ, | ) | |
| | ) | **ORDER** |
| Defendant. | ) | [Resolving ECF No. 21] |

Pending before the Court is Defendant's Motion to Quash Search Warrant and Motion to

Suppress Evidence.  ECF No. 21.  The parties have fully briefed the matter.  ECF Nos. 22, 24.[1]

For the reasons set forth below, Defendant's motion is denied.

## I.  Background[2]

Beginning in November 2018, the United States Federal Bureau of Investigation ("FBI"),

in conjunction with the Mahoning Valley Law Enforcement Task Force ("MVLETF")

(collectively, the "Joint Task Force") began investigating Defendant and his half-brother, Frank

Martinez, Jr. ("Martinez, Jr.") for narcotics trafficking in the Youngstown, Ohio area.  ECF No.

23-1 at PageID #: 152 – 153.  In connection with the investigation, the Joint Task Force used

---

[1]  The Government filed the Affidavit of Federal Bureau of Investigation Special Agent
Lee R. Stalnaker ("SA Stalnaker") as a supplement to its opposition.  ECF No. 23-1.

[2]  The factual background section is derived largely from SA Stalnaker's Affidavit.
ECF No. 23-1.  Defendant disputes the sufficiency of the affidavit to establish probable cause
by referencing specific factual gaps within it.  The Court addresses the disputes herein.

(4:21CR120)

three Confidential Sources – Confidential Source 1 ("CS1"), Confidential Source 2 ("CS2"), and Confidential Source 3 ("CS3").  CS1 informed the Joint Task Force that Defendant would provide Martinez, Jr. with money to purchase narcotics in Texas, and then Martinez, Jr. would transport the narcotics back to Ohio.  *Id*. at PageID #: 152.  After Martinez, Jr. reached Ohio with the narcotics, Defendant would then compensate Martinez, Jr. for successfully transporting the narcotics.[3]  *Id*. at PageID #: 152 – 153.  During the third full week of October 2020, CS2 informed the Joint Task Force that Defendant was using a house in Youngstown, Ohio to distribute narcotics.  CS2 identified the house on a map, located at 3515 Neilson Avenue, Youngstown, Ohio 44502 ("Premises 1").  *Id*. at PageID #: 153 – 154.  Beginning in November 2020, the Joint Task Force began working with CS3, who informed the Joint Task Force that (1) Defendant was utilizing Premises 1 to distribute narcotics to them (CS3), (2) Defendant was using a house near Premises 1 to store narcotics, (3) Defendant operated a vehicle with hidden compartments that could conceal multiple kilograms of narcotics, (4) Defendant utilizes a cell phone to facilitate narcotics transactions and instructed CS3 to contact him via cell phone to acquire narcotics, and (5) Defendant was expecting multiple kilograms of fentanyl to be delivered in the next couple of weeks.  *Id*. at PageID #: 154 – 155.

---

[3]  Martinez, Jr. was indicted for Possession with Intent to Distribute Cocaine, a Schedule II Controlled Substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii)(II). In January 2020, Martinez, Jr. was sentenced to 120 months of incarceration followed by five (5) years of Supervised Release.  *See United States of America v. Martinez*, Case No. 4:19-CR-00208 (N.D. Ohio January 10, 2020) (ECF No. 33) (showing the judgment sentencing Martinez, Jr. to the custody of the United States Bureau of Prisons for a total term of 120 months followed by five (5) years of Supervised Release).

(4:21CR120)

## A.  December Controlled Purchase

In December 2020, CS3 conducted a controlled purchase of fentanyl from Defendant.  Prior to the controlled purchase, CS3 communicated with Defendant via FaceTime, a video teleconference platform featured on AppleiOS products,[4] about CS3's anticipated controlled purchase of fentanyl.  *Id*. at PageID #: 156.  During the FaceTime call, Defendant instructed CS3 to come to Premises 1, which CS3 did, via motor vehicle.  *Id*.  Joint Task Force officers then placed an audio and video recording device on CS3's person and followed CS3 to the pre-determined meet-up location.  *Id*. at PageID #: 156 – 157.  When CS3 reached Premises 1, Defendant entered CS3's motor vehicle, and, a short time after, Defendant and CS3 both exited the vehicle and entered Premises 1.  *Id*. at PageID #: 157.  Using government funds, CS3 purchased fentanyl from Defendant.  *Id*.

Following the controlled purchase, CS3 reported back to the Joint Task Force that (1) after a short discussion about the concealment of narcotics with Defendant while inside CS3's motor vehicle, they both entered Premises 1 through the back door, (2) CS3 observed both a rifle leaning against the wall in the corner of a room and multiple ounces of cocaine, in the same room, inside Premises 1, and (3) Defendant exited Premises 1 and then returned to Premises 1 with a dark colored bag containing approximately three kilograms of fentanyl and a separate quantity of fentanyl pre-packaged for CS3, which Defendant provided to CS3 in exchange for the official government funds.  *Id*. at PageID #: 157 – 158.  Following the controlled purchase, the Joint Task Force searched CS3's person and reviewed the data captured on the audio and

---

[4]  *See* https://www.apple.com/ios/ios-15/ (last visited March 2, 2022).

(4:21CR120)

video recording device placed on CS3's person, which confirmed the details CS3 reported regarding controlled purchase. *Id.*

Later in December, CS3 reported that Defendant made contact to inquire whether they needed narcotics prior to Defendant heading out of town. *Id. at PageID #: 157 – 158*. A few days later, electronic surveillance observed a gray Cadillac Escalade with Florida registration #IDB-M289 (hereinafter "Vehicle 1") enter the driveway of Premises 1.[5] *Id.* CS3 confirmed that Defendant had returned to Youngstown, Ohio that day. *Id.* Two days later, electronic surveillance observed Vehicle 1 park in front of Premises 1. *Id.* Defendant exited the driver's seat, opened the rear driver-side vehicle door, showed an individual something in the back seat, then Defendant entered the driver's seat and departed. *Id.*

### B. January Controlled Purchase[6]

In early January 2021, Joint Task Force surveillance teams observed Vehicle 1 back into the driveway of a house at 126 Wesley Avenue, Youngstown, Ohio 44509 ("Premises 3"). *Id. at PageID #: 159*. The next day, Joint Task Force surveillance teams, again, observed Vehicle 1 back into the driveway of Premises 3 and, later, parked on the street in front of a house on Hazeltine Avenue in Youngstown, Ohio. *Id.* A short time afterwards, Vehicle 1 departed the Hazeltine Avenue address and traveled to Premises 1, without any stops. *Id.* Electronic surveillance observed: (1) multiple vehicles arrive and depart while Vehicle 1 was at Premises 1

---

[5] The Government states that Vehicle 1 is not registered to Defendant. ECF No. 23-1 at PageID #: 158.

[6] Defendant states that the Government is attempting "to alter the affidavit and influence the Court review of the four corners of the affidavit" because SA Stalnaker's Affidavit references January 2020, instead of January 2021. ECF No. 24 at PageID #: 173. The Court is not persuaded that this amounts to anything more than typographical error on the part of the Government.

4

(4:21CR120)

and (2) an individual walk from a neighboring house to Premises 1 with nothing in his hands, then, a few minutes later, the same individual exited Premises 1 with a small bag in hand.  *Id*. Vehicle 1 then departed Premises 1 and backed into the driveway of Premises 3 soon thereafter. *Id*.  The following day, Joint Task Force surveillance teams observed Vehicle 1 and a black BMW backed in the driveway at Premises 3.  *Id*.  As Defendant correctly points out, however, the affidavit does not state: (1) who was driving Vehicle 1 when it was backed into the driveway of Premises 3, (2) who drove Vehicle 1 to the house on Hazeltine Avenue, (3) who drove Vehicle 1 from Premises 1 and backed into Premises 3, or (4) who the black BMW, observed at Premises 3, was registered to, or who drove it.  ECF No. 21 at PageID #: 73.

Later that same week, CS3 participated in another controlled purchase of fentanyl from Defendant.  ECF No. 23-1 at PageID #: 160.  Physical and electronic surveillance occurred in the same way as the controlled purchase in December, with officers physically observing from nearby hidden locations, and an audio and video recording device being placed on CS3's person. *Id*.  After being given government funds to facilitate the controlled purchase, CS3 communicated with Defendant over FaceTime, and soon thereafter CS3 arrived at Premises 1.  *Id*.  Defendant notified CS3 that he would arrive at Premises 1 in about 10 minutes.  *Id*.  In the interim time, Joint Task Force surveillance teams observed Defendant exit Premises 3 and drive Vehicle 1 to Premises 1 with no stops.  *Id*. at PageID #: 160 – 161.  Defendant arrived at Premises 1 and entered through the rear door.  *Id*. at PageID #: 161.  While inside Premises 1, CS3 and Defendant engaged in a brief conversation before CS3 gave Defendant the government funds. *Id*.  Joint Task Force surveillance teams then observed Defendant exit Premises 1 and enter 3519 Neilson Avenue, Youngstown, Ohio 44502 ("Premises 2") through the side door.  *Id*.  Shortly thereafter, Defendant returned to Premises 1 with what law enforcement believed to be

5

(4:21CR120)

approximately one kilogram of fentanyl.  *Id*.  Electronic surveillance equipment recorded

Defendant opening, mixing, removing, and weighing the suspected fentanyl.  *Id*.

After the controlled purchase, CS3 gave the  suspected fentanyl to the Joint Task Force

officers and told them:

(1) Defendant entered Premise 1 through the rear door after CS3 had waited for approximately

10 minutes, (2) CS3 and Defendant discussed the prior narcotics transaction and how Defendant

does not keep money at the same location as narcotics in case of a law enforcement action,[7] (3)

CS3 and Defendant exited Premises 1 and then returned to Premises 1 with one kilogram of

suspected fentanyl, (4) Defendant then opened, mixed, and weighed approximately 100 grams of

suspected fentanyl which Defendant provided in exchange for the official government funds.  *Id*.

The suspected fentanyl was weighed and found to be approximately 112 grams.  *Id*.  After the

controlled purchase, Joint Task Force officers reviewed the electronic surveillance recording

from the device attached to CS#'s person, which confirmed the details CS3 provided.  *Id*. at

PageID #: 162.

Based on the foregoing events, the Government sought, was granted, and executed a

warrant to search Premises 1, 2, and 3 on January 6, 2021.  As a result of the search, Defendant

now faces a seven-count indictment.  ECF No. 14.[8]  Defendant only challenges the search of

---

[7]  Defendant also stated that he had attempted to contact CS3 the day prior about
purchasing 5 kilograms of a controlled substance, but Defendant had already sold them to one
buyer.

[8]  Defendant's seven counts are: (1) Distribution of Fentanyl, in violation of 21 U.S.C.
§§ 841(a)(1) and (b)(1)(B)(vi); (2) Distribution of Fentanyl, in violation of 21 U.S.C. §§
841(a)(1) and (b)(1)(B)(vi); (3) Possession with Intent to Distribute Fentanyl, in violation of 21
U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi); (4) Using and Maintaining a Drug premises, in violation
of 21 U.S.C. § 856(a)(1) and (b); (5)  Using and Maintaining a Drug premises, in violation of
21 U.S.C. § 856(a)(1) and (b); (6) Possessing Firearms in Furtherance of a Drug Trafficking

6

(4:21CR120)

Premises 2 and Premises 3.[9]  Defendant moves the Court to "[q]uash the Search Warrants and

Suppress any and all evidence seized from Premises 2 and 3."  ECF No. 21 at PageID #: 72.  As

support, Defendant states that the affidavit (1) "clearly failed to supplement its basic facts with a

concrete nexus tying [Defendant] and the transactions to [Premises 3,]" and (2) "only provided

the surveillance officers' unsubstantiated hunch that [Defendant] transported narcotics from

Premises 2 to Premises 1."  Id. at PageID #: 82.  In response, the Government maintains that the

affidavit contained sufficient factual support to establish a sufficient nexus between Defendant's

illegal conduct and the locations to be searched so probable cause existed to search both

Premises 2 and Premises 3.  ECF No. 22 at PageID #: 115 – 118.

## II.  Discussion

"The Fourth Amendment protects individuals from 'unreasonable searches and

seizures.'"  United States v. Mitchell, No. 21-5571, 2021 WL 5772534, at *3 (6th Cir. Dec. 6,

2021) (quoting U.S. CONST. amend. IV).  "It also provides that a warrant must have probable

cause 'supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized.'"  Mitchell, No. 21-5571, 2021 WL at *3 (quoting

U.S. CONST. amend. IV).  "Probable cause 'is not a high bar,' D.C. v. Wesby, 138 S. Ct. 577,

586 (2018) (quoting Kaley v. United States, 571 U.S. 320, 338 (2014)), as it 'requires only a

probability or substantial chance of criminal activity, not an actual showing of such activity[.]"

Mitchell, No. 21-5571, 2021 WL at *3 (quoting Illinois v. Gates, 462 U.S. 213, 243–44 n.13

---

Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (7) Felon in Possession of Firearms, in
violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  ECF No. 14.

[9]  Defendant admits that "[t]he affidavit [] provided probable cause to believe Mr. Ortiz
was dealing drugs at Premise 1."  ECF No. 21 at PageID #: 82.  He disputes that it provided
probable cause to believe he was dealing drugs from Premises 2 or Premises 3.

7

(4:21CR120)

(1983)).  "[T]o show that probable cause supports a search warrant, the officer 'must submit an affidavit that indicate[s] a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *Mitchell*, No. 21-5571, 2021 WL at *3 (quoting *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018)).  The search warrant affidavit must establish a "nexus between the place to be searched and the evidence sought." *Mitchell*, No. 21-5571, 2021 WL at *3 (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004)).

"We examine the 'four corners' of a search warrant affidavit 'under the totality of the circumstances' and with "great deference toward the issuing judge's determination.'" *Mitchell*, No. 21-5571, 2021 WL at *3 (quoting *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021)). "When an affidavit relies on information from a confidential source, examining the totality of the circumstances includes looking to 'a confidential informant's veracity, reliability, and basis of knowledge.'" *Mitchell*, No. 21-5571, 2021 WL at *3 (quoting *Hines*, 885 F.3d at 923).  "If the judge issuing the warrant 'can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause.'" *Mitchell*, No. 21-5571, 2021 WL at *3 (quoting *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005)).

## A.  Search of Premises 2

Defendant argues that the search of Premises 2 was improper because the affidavit "failed to allege specific facts amounting to even a fair probability that contraband would be found in Premises 2." ECF No. 21 at PageID #: 80.  Specifically, Defendant states that the affidavit is insufficient because during the January controlled purchase, (1) "CS3 did not see or know where [Defendant] went" after he exited premises 1 and re-entered Premises 1 with a bag containing narcotics (*Id*. at PageID #: 74), and (2) "[t]he affidavit did not state that CS3 saw [Defendant] remove the fentanyl from under his shirt or where

8

(4:21CR120)

[Defendant] retrieved the fentanyl from" (*Id.* at PageID #: 74 – 75).  The Government alleges that CS3 observed Defendant exit Premises 1, enter Premises 2, and return to Premises 1 with an approximate kilogram of fentanyl.  The Government also alleges that CS3 then observed Defendant open, mix, remove, and weigh the suspected fentanyl, then proceed to supply CS3 with fentanyl, in exchange for the funds the Government supplied CS3 with.

The combination of CS3's observations during the January controlled buy and the corroboration provided by the Joint Task Force officers' electronic surveillance of Defendant's activity provide sufficient facts to justify the granting and execution of a search warrant for Premises 2.  Defendant's arguments are not persuasive because law enforcement officers *did* observe Defendant enter Premises 2, and Defendant *did* indeed provide CS3 with fentanyl in exchange for U.S. currency, which was corroborated by the Joint Task Force's search of CS3 after the January controlled buy.  Neither of those facts are disputed by Defendant.  What is undisputed is that Defendant exited Premises 1, was soon after observed by law enforcement entering Premises 2, returned to Premises 1, and provided CS3 with fentanyl, as confirmed by electronic surveillance and a search of CS3 after the January controlled buy.

Surveillance from law enforcement and/or information from confidential sources has been deemed sufficient to establish probable cause in a search warrant affidavit.  *Mitchell*, No. 21-5571, 2021 WL at *4 (explaining search warrant affidavit was sufficient because the "affidavit did not rely solely on [a] tip, but included [the officer's] investigation that revealed activity consistent with drug trafficking"); *United States v. Hines*, 885 F.3d 919 (6th Cir. 2018) (holding that "search warrant affidavit demonstrated specific and concrete nexus between defendant's residence and drug trafficking" because "[a]fter CS1 informed officers in July 2015

(4:21CR120)

that [Defendant] was selling large quantities of heroin out of [Defendant's supply home]," officers "conducted surveillance at the residence on occasion" and observed Defendant "arrive and depart the residence with regularity."); *Cf. United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (holding that the "search warrant affidavit did not show nexus between defendant's home and drug trafficking" because "the search warrant affidavit contained no evidence that [Defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there" and "[t]he affidavit did not suggest that a reliable confidential informant had purchased drugs there, that the police had ever conducted surveillance at [Defendant]'s home, or that the recorded telephone conversations linked drug trafficking to [Defendant]'s residence").

Accordingly, the search warrant affidavit was sufficient to establish probable cause to search Premises 2.

## B.  Search of Premises 3

Defendant avers that the search of Premises 3 was improper because the "affidavit failed to provide any basis, let alone probable cause, to believe evidence of the described crimes would be located" at Premises 3.  ECF No. 21 at PageID #: 76.  Specifically, SA Stalnaker's Affidavit fails to identify who was driving Vehicle 1 when it was observed (1) backed into the driveway at Premises 3, (2) parked in front of the house on Hazeltine Avenue, (3) driven from the house on Hazeltine Avenue to Premises 1, and (4) driven from Premises 1 to Premises 3.  The affidavit also fails to identify who was driving the black BMW seen at Premises 3, or who it was registered to.  The Government maintains that the affidavit contains sufficient factual support to establish probable cause to search

(4:21CR120)

Premises 3 because of the amount of times Vehicle 1 was seen traveling to and from

Premises 3.  ECF No. 22 at PageID #: 118 – 120.

       "Even if no specific evidence ties drug dealing to a home," it is well-established

in the Sixth Circuit "that a nexus to search the home can exist if a suspect's drug dealing

is 'ongoing' at the time the police seek the warrant."  *United States v. Reed*, 993 F.3d

441, 448–49 (6th Cir. 2021) (quoting *United States v. Feagan*, 472 F. App'x 382, 392

(6th Cir. 2012)).  "When an officer identifies 'recent, reliable evidence of drug

activity,'" it "can provide a 'reason to believe that drugs or other evidence of crime [will]

be found in the suspect's' home[.]"  *Reed*, 993 F.3d at 448–49 (quoting *United States v.

McCoy*, 905 F.3d 409, 417 – 418 (6th Cir. 2018).  Also, law enforcement officers are

permitted to rely on their experience to help establish probable cause that illegal activity

is occurring, justifying a search.  *Reed*, 993 F.3d at 452.

       In the instant case, the search warrant affidavit provided sufficient basis to believe

evidence of criminal activity would be found at Premises 3 because of Joint Task Force

officers' observations of Vehicle 1 prior to, during, and after multiple suspected drug

transactions.  The Court will focus on three specific instances, one occurring in

December 2020, and the other two occurring in January 2021.  Beginning with December

2020, Joint Task Force officers observed Defendant exit the driver's seat of Vehicle 1,

open the rear driver-side door, show an individual something in the back seat, then

Defendant returned to the driver seat and drove away.[10]  Next, in early January 2021,

---

       [10]  This fact is of particular importance when considering that CS3 told Joint Task Force officers that Vehicle 1 had hidden compartments that could conceal multiple kilograms of narcotics.

11

(4:21CR120)

Joint Task Force officers observed Vehicle 1 drive from an address on Hazeltine Avenue in Youngstown, Ohio, directly to Premises 1 and park.[11] Next, Joint Task Force surveillance observed multiple vehicles arrive and depart while Vehicle 1 was parked there, and then an individual entered Premises 1 empty-handed, and exited Premises 1 with a small bag in hand. Finally, after Defendant and CS3 arranged for the sale of fentanyl during the controlled purchase in January, Joint Task Force surveillance teams observed Defendant exit Premises 3 and travel directly to Premises 1 using Vehicle 1.

Taken together, probable cause existed because Joint Task Force officers observed Vehicle 1 travel directly from Premises 3 to Premises 1, a location where the officers had obtained recent, reliable evidence that Defendant was trafficking fentanyl, namely the controlled purchases in December 2020 and January 2021. In fact, Defendant arrived at Premises 1 directly from Premises 3 immediately before he sold fentanyl to CS3 during the January controlled purchase. While earlier the Court concluded that a search of Premises 2 was warranted because of the probability that Defendant had fentanyl in Premises 2, it is still possible that Defendant utilized Premises 3 in connection with the sale of narcotics, which would justify a search of Premises 3. Defendant's arguments relating to the affidavit's failure to identify the driver of Vehicle 1 are unpersuasive because Joint Task Force officers directly observed Defendant operate Vehicle 1 at Premises 1 in late December 2020, and *en route* to Premises 1 for the January controlled purchase. Regarding the challenge to the identity of the individual who operated Vehicle 1 from the Hazeltine Avenue address to Premises 1, even if it were

---

[11] It is unclear if Defendant was operating Vehicle 1 during this instance.

(4:21CR120)

not Defendant, that activity still shows Vehicle 1's connection to Premises 1 and probable involvement in narcotics trafficking.[12]

 In addition, SA Stalnaker attested that, based on his knowledge, training, and experience "narcotics traffickers do not store money, guns and narcotics at a single location and frequently store them at their residences."  ECF No. 23-1 at PageID #: 159. This gave the magistrate judge additional support to find the search warrant affidavit established probable cause.  *United States v. Gunter*, 266 F. App'x 415, 419 (6th Cir. 2008) (explaining that sufficient nexus between defendant's illegal activities and his residence was established because "instant affidavit describes an incident where law enforcement agents observed [defendant] visiting his residence right before he traveled to the site of a drug sale" which "provided a neutral magistrate with a substantial basis to conclude that [defendant] may have stopped at his residence to pick up some of his merchandise before meeting his customer at another location"); *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (holding "officer's affidavit established probable cause to believe that evidence of illegal drug activity would be found at second defendant's residence" because the affidavit stated, in the affiant's experience, many drug traffickers use their residences to conduct their drug trafficking activities); *Cf. United States v. Fitzgerald,* 754 F. App'x 351, 360 (6th Cir. 2018) (holding "search warrant affidavit failed to establish adequate nexus between defendant's drug activity and the residence" because *"*officers did not observe any drug activity at or near [Defendant]'s residence.)  Probable cause existed to search Premises 3 because Joint Task Force

---

[12]  The identity of the driver and registrant of the black BMW does not weigh into the Court's analysis here.

(4:21CR120)

officers, already possessing recent and reliable evidence of Defendant's drug trafficking, observed Defendant directly operate Vehicle 1 at Premises 1 and Premises 3 in close proximity to that corroborated drug dealing.

### III.  Conclusion

For the foregoing reasons, Defendant's motion (ECF No. 21) is denied.  The Final Pretrial Conference is scheduled for March 3, 2022 at 1:30 p.m., and Trial is scheduled to commence on March 21, 2022 at 9:00 a.m.


IT IS SO ORDERED.


March 2, 2022                                        /s/ Benita Y. Pearson
Date                                                         Benita Y. Pearson
                                                                United States District Judge

14